IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SAMANTHA L. SUVER,

              **Plaintiff,**

vs.                                  **No. CIV 01-1454 WDS**

JO ANNE B. BARNHART, Commissioner
of the Social Security Administration,

              **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse or Remand Administrative Agency Procedure filed September 26, 2002 **[docket # 12].** Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security, who determined that she was not eligible for Supplemental Security Income benefits. The Court, having considered Plaintiff's Motion **[docket # 12],** Memorandum in Support of Plaintiff's Motion **[docket #13],** Defendant's Response **[docket # 16],** Plaintiff's Reply **[docket # 17],** the administrative record and applicable law, finds that Plaintiff's Motion should be **GRANTED IN PART,** and that this matter should be remanded to the Commissioner for further proceedings in accordance with this Memorandum Opinion and Order.

## Procedural Background

Plaintiff, who was born on May 9, 1973, **Tr. at 41,** filed her initial application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act on March 13, 1998. **Tr. at 87-89.** After Plaintiff's application was denied at the initial level on August 6, 1998, **Tr. at 67-70,** she filed a request for reconsideration on January 22, 1999, **Tr. at 73.** Her request for reconsideration was denied on April 1, 1999, **Tr. at 76-78,** and she thereafter appealed by filing a

request for hearing by an administrative law judge ("ALJ") on May 10, 1999, **Tr. at 79.**

The hearing before the ALJ was held on October 5, 1999, at which Plaintiff appeared and was represented by an attorney. **Tr. at 35-64.** Plaintiff alleged that she was disabled as a result of mental and physical impairments, including bipolar and anxiety disorders, asthma, and a skin condition. **Tr. at 45-46.** In a decision dated February 16, 2000, the ALJ denied Plaintiff SSI benefits. **Tr. at 13-29.** Plaintiff then filed a request for review with the Appeals Council on April 19, 2000. **Tr. at 10-12.** The Appeals Council denied Plaintiff's request for review on November 6, 2001, **Tr. at 8-9,** and thereby rendered the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner"). *See* 20 C.F.R. § 416.1481 (2003).

Plaintiff filed this action on December 31, 2001 in which she seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 1383(c)(3). The parties have consented to the undersigned United States Magistrate Judge conducting all proceedings, **[docket # 20, 21],** and on September 3, 2003, this case was reassigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) **[docket #22].**

## Standard of Review

This Court may only review the Commissioner's decision to determine whether it is supported by substantial evidence and whether correct legal standards were applied. *Andrade v. Secretary of Health & Human Servs.,* 985 F.2d 1045, 1047 (10th Cir. 1993). In determining whether the Commissioner's findings are supported by substantial evidence, the Court should not re-weigh the evidence, nor should it substitute its judgment for that of the Commissioner. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994). Instead, the Court should meticulously examine the record to determine whether the Commissioner's decision is supported by "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1993).  The "substantial evidence" standard is satisfied by more than a scintilla, but less than a preponderance, of evidence.  *Id.*  However, evidence is not substantial if it is overwhelmed by other evidence or if it constitutes a mere conclusion.  *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir. 1989).

To be eligible for SSI benefits, a claimant's income and financial resources must fall below a certain level, and he or she must meet the statutory definition of an "aged, blind or disabled" person. *See* 42 U.S.C. § 1382(a).  An adult claimant is disabled for SSI purposes if he or she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

A sequential five-step analysis applies in determining whether an adult claimant is disabled. *See Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003) (citing *Williams v. Bowen,* 844 F.2d 748, 750-52 (10th Cir. 1988)); 20 C.F.R. § 416.920 (2003).  First, the question is whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 416.920(a) (2003).  If so, the claimant is not disabled; if not, the analysis proceeds to step two.  *Id.*  At the second step, the question is whether the claimant has an impairment or combination of impairments that is severe.  *Id.*; *Williams,* 844 F.2d at 750.  If not, the claimant is not disabled; however, if the claimant makes the required showing of severity, the analysis proceeds to step three.  *Williams,* 844 F.2d at 750-51.  At step three, the question is whether the claimant has an impairment or combination of impairments that meets or equals an impairment listed at Appendix 1, Subpart P, of 20 C.F.R. Part 404 ("Listings" or "Listed Impairment") and also satisfies the durational requirements.  20 C.F.R. § 416.920(d) (2003).  If so,

3

the impairment is considered to be presumptively disabling and the claimant is entitled to benefits. *Williams,* 844 F.2d at 751.  If not, the analysis proceeds to step four, where the question is whether the impairment prevents the claimant from doing past work.  *Id.*  The claimant is not disabled if he or she can perform past work.  *Id.*  If the claimant cannot perform past work, the analysis proceeds to step five.  *Id.*  At step five, the burden shifts to the Commissioner to establish that the claimant has the residual functional capacity "to perform other work in the national economy in view of his age, education and work experience."  *Id.* (quoting *Bowen v. Yuckert,* 482 U.S. 137, 142 (1987)).

## Summary of the ALJ's Decision

The ALJ ruled at step one that the Plaintiff had not engaged in substantial gainful activity during the period under review.  **Tr. at 16.**  Although his decision does not contain an explicit step two finding that the claimant's impairment, or combination of impairments, is severe, the ALJ proceeded to steps three through five of the sequential analysis.  I will therefore assume that the ALJ found that Plaintiff's impairments are severe.  At step three, the ALJ found that the severity of Plaintiff's impairment or combination of impairments did not meet or medically equal any Listed Impairment.  **Tr. at 16-17.**  At step four, the ALJ found that Plaintiff "has no history of past relevant work, so there is no issue as to whether she has been able to return to any category of past relevant work."  **Tr. at 20.**  At step five, the ALJ found that Plaintiff is able to perform jobs that exist in significant numbers in the national economy including coin machine collector, surveillance system monitor, food deliverer, and candy cutter.  **Tr. at 20.**

## Analysis

Plaintiff contends that the ALJ made several errors in denying her benefits.  I will address each contention in turn below.

### 1.      Disabling Joint Pain

At the hearing before the ALJ, Plaintiff testified that she has "a lot of pain" in her back, her knees and her hips that occurs "[m]ostly during the afternoon and at night," and that her pain lasts an hour or two on some occasions and all day on other occasions.  **Tr. at 53-54.**  Plaintiff also testified that her doctors give her pain medication, but that she does not take it because she became addicted to pain medication about three years before the hearing.  **Tr. at 54.**  The ALJ determined that Plaintiff's complaints of chronic multiple joint pain were not credible and were likely associated with drug seeking behavior.  **Tr. at 19.**  Plaintiff contends that this determination was erroneous, and that the ALJ should instead have requested more information on her joint pain from a doctor. For the following reasons, I find that the ALJ's decision is supported by substantial evidence,  and the ALJ was not required to request further information from a doctor.

A claimant's subjective allegation of pain, in and of itself, is not sufficient to establish disability. *E.g., Thompson v. Sullivan,* 987 F.2d 1482, 1488 (10th Cir. 1993).  Rather, "[b]efore the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment . . . that could reasonably be expected to produce the alleged disabling pain."  *Id.* (citing *Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir. 1987)).  In an apparent attempt to meet her burden of proof, Plaintiff asserts that the ALJ "determined that her joint condition was complicated by longstanding use of Prednisone," which she took for her asthma and eczema. Pl.'s Mem. Br. at 7.  Plaintiff points to no other evidence to link her alleged joint pain with any impairment that could reasonably be expected to produce such pain.

Contrary to Plaintiff's assertion, I do not think the ALJ found that Plaintiff's "joint condition" was complicated by her use of the drug Prednisone.  The ALJ wrote:

As for [Plaintiff's] complaints of multiple joint pain, I find those complaints not credible and likely associated with drug seeking behavior. The claimant has not been diagnosed as having any joint condition reasonably expected to cause such symptoms, and no doctor has recommended any restrictions on her activities due to any joint condition. More recently, the claimant has been evaluated for a chronic mild elevation of her white blood cell count. Her doctors suspect autoimmune adrenal insufficiency. However, her condition is complicated by longstanding use of Prednisone (Exhibit 41F). The cause for her elevated white blood cell count is unclear, and her doctors do not indicate that this condition results in any particular functional problem. I find no reason to surmise that it prevents the claimant from performing light work activities.

**Tr. at 19.** The ALJ appears to have been addressing Plaintiff's "chronic mild elevation of her white blood cell count" and not her allegations of joint pain when he stated that her "condition" was complicated by Prednisone use. Despite Plaintiff's failure to identify objective medical evidence that could establish the existence of a pain-producing impairment, such evidence may exist in the record. Plaintiff was seen by Dr. Brunilda Nazario at the University of New Mexico Hospital on November 16, 1999 for an elevated white blood cell count. **Tr. at 669.** Dr. Nazario suspected that Plaintiff might have autoimmune adrenal insufficiency as a polyendocrine disorder, **Tr. at 670,** and also suspected that Plaintiff's "multiple symptoms including joint pain and possibly the mild elevations in her white cell count" were consistent with adrenal insufficiency, **Tr. at 672.** Thus, while the record does not indicate that Plaintiff was actually diagnosed with adrenal insufficiency, the evidence suggests that Plaintiff may have had an impairment that could produce joint pain.

Assuming for purposes of argument that objective medical evidence showed the existence of an impairment that could reasonably have been expected to produce joint pain, the ALJ would then have been required to consider all the evidence presented to determine whether Plaintiff's pain was in fact disabling. *Luna v. Bowen,* 834 F.2d 161, 163-64 (10th Cir. 1987). At this stage, the ALJ may decide whether he believes the claimant's allegations of pain. *Id.; Kepler v. Chater,* 68 F.3d 387, 391

(10th Cir. 1995).  Evidence relating to Plaintiff's allegations of pain may be summarized as follows.

From 1995 to 1999, Plaintiff obtained prescriptions for pain medications including Tylenol #3, Vicodin, Lortab, Lorcet, Demerol, and Darvocet from several medical providers.  **Tr. at 146, 275-77, 452, 536-37, 561, 563-65.**  The majority of Plaintiff's complaints during this period were for back pain, **Tr. at 149-51, 274-77, 145-46,** although Plaintiff also obtained prescription pain medication by complaining of body aches, **Tr. at 145,** and back and hip pain, **Tr. at 454.**  One of Plaintiff's treating physicians noted that, while Plaintiff complained of pain in "various localities," she had been an example of drug seeking behavior.  **Tr. at 210.**  Indeed, even though Plaintiff obtained pain medication by complaining of pain, Plaintiff admitted that she used the medication "just to relax," **Tr. at 274,** because it calmed her nerves and mellowed her out, **Tr. at 343,** and because she felt that "pain meds are necessary for mood control,"  **Tr. at 544.**

From 1995 through 1999, several of Plaintiff's medical providers also refused her requests for refills of pain medications.  **Tr. at 145, 149.**  For example, on August 22, 1995, a physician at Socorro Medical Associates suspected that Plaintiff was abusing pain medication and refused to fill Plaintiff's prescription for Tylenol #3 because she "sort of dissembled."  **Tr. at 153.**  In addition to refusing requests for prescriptions, at least one of Plaintiff's treating physicians refused to continue treating Plaintiff because of her persistent drug seeking behavior.  In December 1997, Plaintiff was hospitalized for a respiratory infection.  At that time, Dr. John Most wrote:

> [Plaintiff] has been a little demanding of narcotics and anxiolytics while in the hospital and she has told me that she was in detoxification for this up in Farmington and her overuse of these drugs led to my dismissing her before.  I have taken her back on as a patient on the condition that she keep this usage of narcotics only to what is necessary to relieve her present condition and she is well aware of this.

*******

[Plaintiff] has had many complaints of pain in various localities and has been an example of drug seeking behavior in the past. She states to me that she has been in a detox program in Farmington during the time she has been away from the community. Toward the end of her previous episode in Carlsbad I had refused to take care of her because of her persistent drug seeking behavior. When she came back I was more or less drawn into it by default. I will attempt to take care of her and I will attempt to keep her from overuse of drugs at this time and if this does not prove to be successful I will again dismiss her as a patient.

**Tr. at 209-10.**

In January of 1998, Plaintiff reported to her counselor at Carlsbad Mental Health Association ("CMHA") that she had been addicted to Vicodin for two years. **Tr. at 343.** The evidence also indicates that Plaintiff's addiction continued in 1999. In April 1999, Plaintiff saw physician's assistant ("P.A.") R.M. Gaupel and reported that she was suffering severe pain from a fractured coccyx she had suffered three to four weeks earlier. **Tr. at 565.** Although the P.A. initially prescribed Darvocet, the P.A. subsequently revoked the prescription upon discovering that Plaintiff had altered the prescription by adding a "#1" under the item marked "refill." **Tr. at 565.** In an attempt to explain what happened, Plaintiff claimed that her nine-year-old daughter made an "L" in the refill space and had also written "Ls" on the back of her prescriptions. **Tr. at 566.** However, the pharmacist to whom Plaintiff presented the prescription stated that there was no writing on the back of the prescription, and the refill space was marked with an obvious "#1." **Tr. at 566.** This incident led the P.A. to conclude that Plaintiff "apparently has a substance abuse problem." **Tr. at 566.**

Plaintiff sought drug abuse counseling in approximately June of 1999. On June 18, 1999, Plaintiff indicated to her counselor at CMHA that heroin was her drug of choice, and that she had smoked and snorted it one month earlier. **Tr. at 543.** Plaintiff also stated that she felt that "pain meds are necessary for mood control." **Tr. at 544.** On June 22, 1999, Plaintiff reported that she

8

"got back on the drugs again." **Tr. at 536.** Plaintiff indicated that she was getting drugs from "multiple docs," and was taking eight to nine pills four times per day. **Tr. at 536.** Although Plaintiff reported being off pain medication on June 28, 1999, **Tr. at 535,** she was apparently taking them again by July 2, 1999. Plaintiff's records from that date indicate that she requested a new prescription because she said she had lost sixty (60) Xanax tablets. **Tr. at 552.** The therapist who spoke to Plaintiff called Wal-Mart and was advised that the day before, on July 1, 1999, Plaintiff had obtained Valium and Lorcet from a dentist. **Tr. at 552.** The therapist advised Plaintiff that she needed to file a police report, and the therapist would only call in a prescription for Xanax because Plaintiff already had Valium for sleep. **Tr. at 552.**

In light of the foregoing evidence, I cannot say that the ALJ erred when he found that Plaintiff's complaints of disabling multiple joint pain were not credible and were likely associated with drug seeking behavior. In deciding whether a claimant's allegations of disabling pain are credible, the ALJ should consider several factors including:

> [T]he levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir. 1991) (quoting *Huston v. Bowen,* 838 F.2d 1125, 1132 (10th Cir. 1988)). An analysis of the levels of pain medication taken by Plaintiff and their effectiveness, the extensiveness of Plaintiff's attempts to obtain relief, the frequency of her medical contacts, and her motivation in seeking pain medication, is clouded by Plaintiff's undisputed history of drug seeking behavior. On one hand, the fact that Plaintiff was given pain medication may indicate

that, at least initially, Plaintiff had legitimate complaints of pain.[1]  On the other hand, the evidence strongly suggests that at least some of Plaintiff's later complaints were false or exaggerated, and motivated by the desire to satisfy her psychological dependence upon these drugs.  In this regard, the levels of pain medication taken by Plaintiff, which by Plaintiff's description was eight to nine pills four times per day in June of 1999 for a total of thirty-two to thirty-six pills per day, **Tr. at 536,** clearly exceeded therapeutic dosages.[2]  With regard to the extensiveness of Plaintiff's attempts to obtain relief, the record contains no indication that Plaintiff sought any treatment or therapy, other than prescription pain medication, to attempt to control her alleged pain.  Moreover, although Plaintiff made frequent contact with "multiple docs" to request pain medications, **Tr. at 536,** on numerous occasions her requests for prescriptions were refused, *e.g.,* **Tr. at 145, 149, 153, 565.**

My analysis of the remaining factors does not compel the conclusion that the ALJ erred.  First, there is no evidence that Plaintiff's daily activities were limited because of her joint pain.  Plaintiff did not indicate at the hearing that she suffered any limitations as a result of multiple joint pain, but instead testified that she was disabled due to mental impairments, asthma and a skin condition.  **Tr. at 46, 50.**  Second, Plaintiff's medical records are not inconsistent with Plaintiff's testimony that she suffers pain in her back, hips and knees.  *See* **Tr. at 149-51, 274-77, 145-46** (complaints of back pain), **145** (body aches) **454** (back and hip pain), **210** (pain in "various localities"), **452** (chronic pain),

---

[1]The fact that Plaintiff may have had some pain is not sufficient to find her disabled. *See, e.g., Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir. 1988).  "To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Id.* (quoting *Brown v. Bowen,* 801 F.2d 361, 362-63 (10th Cir. 1986)).  Thus, the relevant question is whether Plaintiff has showed she suffers from *disabling* pain.

[2]For example, the total daily dosage for Vicodin should not exceed eight tablets.  Physician's Desk Reference 510 (57th ed. 2003).  The maximum daily dosage of Tylenol #3 with codeine is roughly twelve tablets.  *Id.* at 2507-08.

**136, 146** (chronic back pain).  However, as discussed above, other evidence suggests that Plaintiff may have falsified or exaggerated at least some of her complaints of pain.  Finally, I note that credibility determinations are peculiarly within the province of the ALJ, and an ALJ's determination of a claimant's credibility will not be upset when it is supported by substantial evidence.  *E.g., Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir. 1990).  Given the evidence previously discussed, I find that substantial evidence supports the ALJ's determination that Plaintiff's claims of disabling joint pain were not credible and were likely associated with drug seeking behavior.

I also disagree with Plaintiff's contention that the ALJ erred when he failed to request more information on her joint pain from a doctor.  Although the point is not clearly set out in Plaintiff's Memorandum Brief, Plaintiff apparently contends that the ALJ should have ordered a consultative physical examination regarding her joint pain.  However, when a claimant is represented by counsel at the administrative hearing, as Plaintiff was in this case, the ALJ has no duty to order a consultative examination absent a request by counsel "unless the need for one is clearly established in the record." *Hawkins v. Chater,* 113 F.3d 1162, 1167-68 (10th Cir. 1997).  Plaintiff's counsel made no request for a consultative examination regarding Plaintiff's joint pain at the hearing before the ALJ.  In fact, the only issues raised by Plaintiff's counsel at the hearing related to Plaintiff's skin condition, **Tr. at 56, 58,** her mental impairments, **Tr. at 56-57,** and medication side effects including sleepiness and dizziness, **Tr. at 63.**  Furthermore, because substantial evidence supports the ALJ's determination that Plaintiff's allegations of disabling joint pain were not credible, the need for a consultative examination was not clearly established in the record.  I therefore find that the ALJ was not required to request more information on Plaintiff's joint pain from a doctor.

### 2.    Failure to Follow Treatment for Mental Impairments

Applicable regulations bar a finding of disability where a claimant fails to follow prescribed medical treatment, without good reason, when the treatment can restore the claimant's ability to work.  20 C.F.R. § 416.930(b) (2003).  In addressing Plaintiff's bipolar and anxiety disorders, the ALJ found that Plaintiff's functioning had improved with therapy and medication, but that Plaintiff "became noncompliant with her therapy and medications, and later discontinued treatment." **Tr. at 19.**  In light of these findings, the ALJ found that Plaintiff's mental impairments could not serve as a basis for her claim of disability based upon 20 C.F.R. § 416.930.  *See* **Tr. at 19.**  Plaintiff contends that the ALJ erred when he failed to consider reasons why she may not have been able to continue treatment.  More specifically, Plaintiff contends that the limitations resulting from her mental illness and her inability to deal with other people present a "significant barrier to treatment."

Plaintiff's failure to undertake treatment for her mental impairments would bar recovery of benefits only if the government demonstrates that each of the following findings is supported by substantial evidence:  (1) the treatment at issue was expected to restore Plaintiff's ability to work; (2) the treatment was prescribed; (3) the treatment was refused; and (4) the refusal lacked a justifiable excuse.  *See Teter v. Heckler,* 775 F.2d 1104, 1107 (10th Cir. 1985); *Weakley v. Heckler,* 795 F.2d 64, 65-66 (10th Cir. 1986).  However, the claimant must first demonstrate that he or she is impaired before the burden shifts to the government to demonstrate the foregoing four elements.  *Weakley,* 795 F.2d at 66.  The first question, therefore, is whether Plaintiff demonstrated that she suffered from a mental impairment during the relevant time period, which in this case is from the date of her application for benefits, March 13, 1998, until the date of the ALJ's decision, February 16, 2000.

Evidence in the record relating to Plaintiff's mental impairments from 1998 to 2000 is as

follows.  In January, 1998, Plaintiff sought mental health treatment through the Carlsbad Mental Health Association ("CMHA").  **Tr. at 338-42.**  Plaintiff reported that she had tried to cut her wrists and took eighteen Valium pills a day or two earlier.  **Tr. at 338.**  The CMHA therapist diagnosed Plaintiff with major depression and borderline personality disorder.  **Tr. at 340.**  However, in relation to Plaintiff's suicide attempts the therapist wrote:

> Client did voluntarily seek treatment, however she has been manipulative in doing so calling the agency and hotline several times since coming in in crisis, only to admit that she doesn't think she's suicidal.  These conflicting messages about whether or not she is suicidal leads this therapist to believe that her suicide attempts have only been gestures.  This should further be evaluated in treatment.

**Tr. at 342.**  In May, 1998, while hospitalized for pneumonia, Plaintiff's treating physician referred her to Dr. Cheryl Hollingsworth for a psychiatric consultation.  **Tr. at 454-56, 458.**  Dr. Hollingsworth's diagnostic impressions of Plaintiff included panic disorder and bipolar disorder, **Tr. at 456,** and she prescribed Ativan for Plaintiff's anxiety, **Tr. at 452.**  Plaintiff reported that she was "much better" and that "it made all the difference in the world for her to get the Ativan."  **Tr. at 458.** Roughly one month later, in June 1998, Dr. Hollingsworth evaluated Plaintiff for New Mexico Disability Determination Services.  **Tr. at 294-97.**  Dr. Hollingsworth again diagnosed Plaintiff with panic disorder and bipolar disorder, **Tr. at 297,** and noted that Plaintiff was not taking medication for her panic attacks.  **Tr. at 296.**  At that time, Plaintiff's global assessment of functioning ("GAF") was rated at 70.  **Tr. at 297.**  In June, 1999, Plaintiff also sought substance abuse treatment through CMHA.  **Tr. at 538-45.**  She was diagnosed with depressive disorder and bipolar disorder, **Tr. at 542,** and also indicated that she suffered from anxiety.  **Tr. at 540.**  At that time, Plaintiff's global assessment of functioning ("GAF") was rated at 50.  **Tr. at 545.**

I find that Plaintiff's diagnoses of depressive disorder, panic disorder and bipolar disorder are

sufficient to establish that she suffers from mental impairments.  Thus, before barring recovery of benefits based upon Plaintiff's noncompliance with treatment, the ALJ was required to find that (1) the treatment at issue was expected to restore Plaintiff's ability to work; (2) the treatment was prescribed; (3) the treatment was refused; and (4) the refusal lacked a justifiable excuse.  *See Teter v. Heckler,* 775 F.2d 1104, 1107 (10th Cir. 1985); *Weakley v. Heckler,* 795 F.2d 64, 65-66 (10th Cir. 1986).  However, the ALJ failed to make specific findings as to any of the four required factors, and instead simply determined that "[t]he record clearly reveals that the claimant's functioning was improved after she commenced therapy and medications, and that it became worse after she discontinued treatments. . . .  I find no evidence that she has experienced any significant limitation on her activities of daily living, her social functioning, or her capacities for tolerating normal work stresses, as long as she is compliant with her treatments."  **Tr. at 19.**  For reasons that will be explained below, I find that the ALJ failed to apply correct legal standards.

With regard to the first factor, the ALJ construed 20 C.F.R. § 416.930 to mean that "an individual who is noncompliant with treatments and medications *expected to improve her functioning* will not be found disabled under the standards of the Social Security Act."  **Tr. at 19** (emphasis added).  However, a finding that treatment would be expected to improve Plaintiff's functioning is insufficient as a matter of law, for  the regulation referred to by the ALJ specifically states that "[i]n order to get benefits, you must follow treatment prescribed by a physician *if this treatment can restore your ability to work . . . .*"  20 C.F.R. § 416.930(a)  (2003) (emphasis added); *see also Teter,* 775 F.2d at 1107.  Yet, the ALJ wholly failed to discuss the issue of whether the "medication and therapy" prescribed for Plaintiff's depression, bipolar disorder and panic disorder would be expected to restore Plaintiff's ability to work.

14

With regard to the second factor, I find it difficult to ascertain from the record specifically what medications and therapy were prescribed for Plaintiff's depression, bipolar disorder and panic disorder, and the ALJ made no specific findings on this point.   Yet, Tenth Circuit law requires a finding that treatment was in fact prescribed. *See Teter,* 775 F.2d at 1107 (a finding that treatment not undertaken was merely recommended, rather than prescribed, was an insufficient basis to deny claimant benefits).  With regard to the third factor, evidence in the record does indicate that Plaintiff has been  noncompliant with some treatment for her mental impairments.  However, the ALJ made no specific findings as to what treatment, which was prescribed, Plaintiff failed to follow.  Finally, with regard to the fourth factor, the ALJ wholly failed to address any reasons why Plaintiff might have failed to comply with treatment.  Plaintiff contends that the ALJ erred when he failed to consider the limitations resulting from her mental impairments as reasons why she may not have been able to continue treatment.  I agree, for although I have found no controlling Tenth Circuit precedent, other courts have found that non-compliance that results from a mental impairment may provide a justifiable excuse for failure to comply with treatment.  *See Brashears v. Apfel,* 73 F.Supp.2d 648, 651 (W.D. La. 1999) and cases cited therein.

In view of the foregoing, this case must be remanded for further development of the record as to (1) whether treatment for Plaintiff's mental impairments was expected to restore her ability to work; (2) whether the treatment was prescribed; (3) whether Plaintiff refused the treatment; and, if so, (4) whether Plaintiff's refusal lacked a justifiable excuse.

### 3.	Physical Impairments - Asthma and Eczema

Plaintiff's next contention is that the ALJ failed to consider all the limitations that result from her physical impairments when he assessed her residual functional capacity ("RFC").  The ALJ

15

determined that Plaintiff retained the RFC to perform "unskilled exertionally light work activities which do not involve exposure to fumes." **Tr. at 18.** "Light" work means, among other things, that Plaintiff can do "a good deal of walking or standing." 20 C.F.R. § 416.967 (2003). Plaintiff contends that the ALJ erred when he found that she can perform light work because he failed to take into account her testimony that she cannot walk far because she runs out of breath and because sweat and air burn her skin. **Tr. at 49.**

In assessing Plaintiff's RFC, the ALJ rejected Plaintiff's testimony because he found that her "testimony and reports of symptoms and functional restrictions was not supported by the evidence overall in the disabling degree alleged, and therefore lacked credibility." **Tr. at 17.** For the reasons that follow, I agree that the evidence does not support Plaintiff's testimony regarding the extent of the functional limitations that result from her pulmonary condition. However, I find that the ALJ erred in his decision pertaining to Plaintiff's skin condition.

In rejecting Plaintiff's claims about the functional restrictions resulting from her asthma, the ALJ wrote that Plaintiff "is a heavy smoker, smoking a pack and a half of cigarettes a day. She does not allege that she plans to cease smoking for the sake of her health, nor does she allege that she has ever attempted to cease smoking. This behavior is inconsistent with her complaints of functional difficulties related to her pulmonary condition." **Tr. at 18.** However, Plaintiff testified that she quit smoking six to seven months prior to the hearing. **Tr. at 57.** Although Plaintiff's medical records may be inconsistent with her testimony in that they indicate that she was still smoking one and one-half packages of cigarettes daily roughly three and one-half months before the hearing, **Tr. at 543,** the ALJ clearly erred when he failed to acknowledge Plaintiff's testimony. Nevertheless, even if I discount the ALJ's determination that Plaintiff's smoking was inconsistent with her complaints of

functional restrictions, for the following reasons I find that substantial evidence still supports the ALJ's determination that Plaintiff's pulmonary condition does not preclude her from performing light work activities that do not involve exposure to fumes.

First, the record supports the ALJ's determination that Plaintiff "experiences exacerbations of her pulmonary condition from time to time, but . . . responds promptly to medical intervention." **Tr. at 18.** For example, Plaintiff was hospitalized in December 1997, May 1998, and December 1998 with breathing difficulties. **Tr. at 473, 452, 618.** On each of those occasions, Plaintiff's condition improved greatly with treatment, and she was discharged after a few days. **Tr. at 473, 452, 461, 618.** Second, the record also supports the ALJ's determination that Plaintiff's "pulmonary function tests in between exacerbations show overall normal pulmonary functioning or only mild abnormalities." Plaintiff's pulmonary function test dated June 26, 1998 demonstrated "mild obstructive airways disease with some small airways obstruction." **Tr. at 327.** A later test dated December 22, 1998 stated that "[t]hese pulmonary function tests are virtually normal. There are changes which might indicate minimal small airways obstruction. There is improvement after bronchodilators." **Tr. at 426.** The record therefore indicates that Plaintiff's pulmonary condition is virtually normal or mildly impaired, and when she does suffer exacerbations, she responds quickly to treatment. Accordingly, I cannot say the ALJ erred when he concluded that Plaintiff's asthma does not prevent her from performing light work that does not involve exposure to fumes. I find that, at least with respect to Plaintiff's asthma, the ALJ's determination that Plaintiff can perform light work is supported by such relevant evidence as a reasonable mind might accept as adequate to support that conclusion.

On the other hand, I find that the ALJ erred in his decision regarding Plaintiff's dermatitis. As support for his finding that Plaintiff's claims of functional restrictions were not credible, **Tr. at**

**17,** the ALJ first relied upon the fact that Plaintiff did not find it necessary to seek regular medical treatment for her skin condition, **Tr. at 18-19.** However, before an ALJ may rely on a claimant's failure to pursue medical treatment as support for a finding of noncredibility, the ALJ should consider "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse." *Thompson v. Sullivan,* 987 F.2d 1482,1490 (10th Cir. 1993). The ALJ made none of these findings, and therefore applied incorrect legal standards.

In rejecting Plaintiff's claim of functional restrictions resulting from her dermatitis, the ALJ also wrote:

> The record reveals that she has had relatively minor lesions, and experiences severe exacerbations occasionally, but overall her condition responds to topical treatments. No doctor has stated that this condition results in any particular functional restriction, and I find no reason to surmise that it prevents the claimant from performing light work.

**Tr. at 18-19.** I find no evidence to support the ALJ's findings that Plaintiff has had relatively minor lesions or that her condition responds to topical treatments. My review of the record indicates that Plaintiff does have "severe exacerbations." On October 7, 1995, Plaintiff was diagnosed with "severe psoriasis," **Tr. at 139,** or "severe eczema," **Tr. at 142.** On June 2, 1996, Plaintiff was diagnosed with "severe psoriasis," and her skin showed "multiple psoriatic lesions on all her extremities and her trunk." **Tr. at 514.** A social security claims examiner who interviewed Plaintiff in January, 1999 wrote that Plaintiff's "arms, hands and feet are scarred and there are fresh scabs from the eczema that causes some rather deep cuts on cheeks, hands, palms on hands." **Tr. at 126.** On February 19, 1999, Plaintiff had "[f]airly severe generalized eczema on neck, trunk, arms, chest, back." **Tr. at 568.** On April 22, 1999, Plaintiff had a "dry, eczematous rash with excoriations." **Tr. at 565.** The ALJ did

not explain how he concluded that Plaintiff has "relatively minor lesions," and I find no evidence to support that conclusion. Moreover, while Plaintiff's medical records indicate that her dermatitis has been treated with Temovate cream, **Tr. at 142,** Prednisone, **Tr. at 514,** and Lidex solution, **Tr. at 569,** I can find no indication that Plaintiff's skin condition "responds to topical treatments." Finally, the ALJ apparently discredited Plaintiff's testimony about the functional restrictions resulting from her eczema based in part on the fact that no doctor had advised that Plaintiff's dermatitis results in any particular functional restriction. It is, however, clear that "[t]he absence of evidence is not evidence." *Thompson,* 987 F.2d at 1491.

In view of the foregoing, the ALJ's finding that Plaintiff's skin condition does not prevent her from performing light work activities lacks substantial support in the record. The record indicates that Plaintiff suffers severe exacerbations of her dermatitis, but it is unclear to what extent her skin condition may limit her ability to work. I therefore remand the case for further development of the record on this issue. I note that in this instance, Plaintiff's counsel raised the issue of impairment resulting from Plaintiff's skin condition at the hearing. **Tr. at 56, 58.** An ALJ is responsible in every case "to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Hawkins v. Chater,* 113 F.3d 1162, 1164 (10th Cir. 1997) (quoting *Henrie v. Department of Health & Human Servs.,* 13 F.3d 359, 360-61 (10th Cir. 1993)). Moreover, where objective evidence in the record indicates "the existence of a condition which could have a material impact on the disability decision requiring further investigation," and further examination would be necessary or helpful to resolve the issue of impairment, the ALJ should order a consultative examination. *Id.* at 1167. Accordingly, if the ALJ finds the existing evidence insufficient to determine the extent to which Plaintiff's dermatitis may limit her ability to work, the ALJ should order

a consultative physical examination to assist in resolving that issue.

### 4.     Effect of Drug Addiction

Plaintiff also contends that the ALJ failed to follow a regulation that pertains to findings of disability where the claimant has a history of drug abuse.  The regulation cited by Plaintiff, 20 C.F.R. § 416.935, implements a statutory provision that bars a finding of disability in SSI cases where "alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 1382c(a)(3)(J).  The implementing regulation sets forth the following procedure.  In cases where there is evidence of drug addiction, the Commissioner must first determine whether the claimant is disabled.  *See* 20 C.F.R. § 416.935(a) (2003); *Drapeau v. Massanari,* 2001 U.S. App. LEXIS 4356, at 11 (10th Cir. 2001).[3] If the Commissioner finds the claimant is disabled, the Commissioner must then determine whether the claimant would still be disabled if he or she stopped using drugs.  20 C.F.R. § 416.935(b)(1) (2003).  If so, the drug addiction is not a contributing factor material to the determination of disability.  20 C.F.R. § 416.935(b)(2)(ii) (2003).  On the other hand, if the claimant would not be disabled if he or she stopped using drugs, the drug addiction is a contributing factor material to the determination of disability.  20 C.F.R. § 416.935(b)(2)(i) (2003).

The gravamen of Plaintiff's argument appears to be that the ALJ did not give adequate consideration to whether Plaintiff is disabled as a result of her mental and physical impairments, and instead based his finding of nondisability on Plaintiff's history of drug abuse.  In other words, Plaintiff apparently contends that the ALJ reversed the analysis set forth in 20 C.F.R. § 416.935 by finding

---

[3]The publication status of the Court's opinion in the *Drapeau* case changed from unpublished to published on June 12, 2001.

that she was not disabled due to her drug addiction without first deciding whether she was disabled by her mental impairments, asthma and dermatitis. However, in order for the ALJ to have *misapplied* this regulation, he would have to have *applied* the regulation in the first place, and I see no indication that the ALJ decided that Plaintiff was not disabled pursuant to 42 U.S.C. § 423(d)(2)(C) or 20 C.F.R. § 416.935. If applicable, those provisions would, in effect, vitiate an existing finding of disability if the claimant's drug addiction was a contributing factor material to the determination that the claimant was disabled. In this case, the ALJ never found that Plaintiff was disabled, and never addressed the question of whether Plaintiff's drug addiction was a contributing factor material to the determination of disability. Instead, the ALJ rejected Plaintiff's claims of disability because he found that 1) Plaintiff's complaints of joint pain were not credible, 2) Plaintiff failed to follow treatment for her mental impairments, and 3) Plaintiff's testimony about the limitations resulting from her pulmonary and skin conditions was not supported by the evidence in the disabling degree alleged and therefore lacked credibility. I therefore find that Plaintiff's argument that the ALJ misapplied 20 C.F.R. § 416.935 is without merit. Of course, if on remand the ALJ finds that Plaintiff is disabled, he would then be required to determine whether Plaintiff's drug addiction was a contributing factor material to his determination of disability.

### 5.    Vocational Expert Testimony

Plaintiff remaining arguments relate to testimony the ALJ solicited from the vocational expert ("VE"). First, Plaintiff asserts that the ALJ found that she could "perform a wide range of sedentary to light work, and that she retains the ability to perform non-public work with no social contact with co-workers or supervisors." Pl.'s Mem. Br. at 11. Plaintiff then contends that the ALJ erred when he "failed to provide reasons for disregarding Plaintiff's numerous statements that she could not be

around people," and that he erred when he failed to solicit testimony from the VE on the effect of her alleged inability to "be around people and get out in public, on the availability of jobs within a full range of sedentary or light work."  I note that Plaintiff has misstated the ALJ's finding as to her RFC. If the ALJ had found that Plaintiff retained the ability "to perform non-public work with no social contact with co-workers or supervisors," Plaintiff's argument would be nonsensical, for such a finding would necessarily mean the ALJ had *accepted* Plaintiff's assertions that she could not be around people.  The ALJ actually found that there was no evidence that Plaintiff had any significant limitations on "her social functioning, or her capacities for tolerating normal work stresses, as long as she is compliant with her treatments."  **Tr. at 19.**  Despite Plaintiff's mischaracterization of the ALJ's RFC finding, I will address her arguments.

Initially, I note that Plaintiff does not identify where in the record she made "numerous statements that she could not be around people."  The only evidence I have located pertaining to Plaintiff's social functioning is as follows.  At the hearing before the ALJ, Plaintiff testified that she is "very anti-social," though she does get along with her relatives.  **Tr. at 53.**  In a third party questionnaire, Plaintiff's mother reported that Plaintiff has no close friends, does not like to be in public, and shies away from crowds when possible.  **Tr. at 116-17.**  Plaintiff's records from the Carlsbad Mental Health Association ("CMHA") dated January 29, 1998 indicate that Plaintiff required intervention "for improved function in behavior, self-esteem, emotional stability, impulse control, and social capacity."  **Tr. at 177.**  Plaintiff's CMHA records dated March 5, 1998 also stated that Plaintiff "lacks the ability to deal with other people and has low self-esteem."  **Tr. at 171.**  On the other hand, in an evaluation performed on July 3, 1998 for New Mexico Disability Determination Services, Dr. Cheryl Hollingsworth noted that Plaintiff stated "that she has never worked outside of

the home, but she feels like she would get along with people . . . ." **Tr. at 296.** Dr. Hollingsworth also noted that Plaintiff "relates very well," and "is personable." **Tr. at 296.** When LeRoy Gabaldon, Ph.D., reviewed Plaintiff's psychiatric issues for the Social Security Administration on August 2, 1998, he concluded that Plaintiff had only slight difficulties in social functioning. **Tr. at 305.**

An ALJ is not required to discuss every piece of evidence in his decision. *Clifton v. Chater,* 79 F.3d 1007, 1009-10 (10th Cir. 1996). However, an ALJ must demonstrate that he considered all of the evidence, and "in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. Although the ALJ stated that he found no evidence that Plaintiff experienced any significant limitation on her social functioning as long as she complied with treatment, he did not address *any* evidence in his decision or explain how he reached this conclusion. Given the evidence cited above, I find that the case must be remanded so that the ALJ can set forth specific reasons for accepting or rejecting evidence pertaining to Plaintiff's social functioning.

Plaintiff also contends that the ALJ erred when he advised the VE that Plaintiff's limitations in concentration, persistence and pace were moderate. Plaintiff apparently contends that the ALJ should have found her limitations were severe because she testified at the hearing that she once forgot to feed her children. Pl.'s Mem. Br. at 11. I do not find this testimony, in and of itself, sufficient to require the ALJ to find that Plaintiff suffered severe limitations in concentration, persistence and pace.

Plaintiff's final contentions, which are set forth for the first time in her Reply Brief, are as follows: 1) the ALJ's statement at the hearing that she suffered "moderate" deficiencies in concentration was inconsistent with his notation on the Psychiatric Review Technique Form; 2) the ALJ improperly defined the term "moderate" for the VE at the hearing; and 3) the jobs of surveillance

system monitor, food deliverer, and candy cutter are not appropriate for a person with Plaintiff's RFC. However, I will not consider arguments raised for the first time in a Reply Brief. *See Stump v. Gates,* 211 F.3d 527, 533 (10th Cir. 2000) (court will not ordinarily review issues raised for the first time in a reply brief); *Sadeghi v. INS,* 40 F.3d 1139, 1143 (10th Cir. 1994) (court generally does not consider issues raised for the first time in a reply brief, except where those issues relate to jurisdictional requirements).

## Conclusion

In sum, I find that the ALJ erred when he 1) found that Plaintiff's mental impairments were not disabling because she failed to follow treatment; 2) found that Plaintiff's dermatitis did not prevent her from performing light work activities; and 3) failed to discuss the evidence relating to his conclusion that Plaintiff did not experience any significant limitation on her social functioning. Accordingly, this matter shall be remanded to the Commissioner of Social Security with instructions to conduct additional proceedings at step five of the sequential evaluation process. The additional proceedings shall include:

1)      With regard to Plaintiff's mental impairments, the Commissioner shall determine whether treatment was expected to restore Plaintiff's ability to work, whether the treatment was prescribed, whether Plaintiff refused the treatment, and if so, whether Plaintiff's refusal lacked a justifiable excuse;

2)      The Commissioner shall further develop the record to properly determine what functional restrictions, if any, are caused by Plaintiff's dermatitis; and

3)      The Commissioner shall set forth specific reasons for accepting or rejecting evidence pertaining to Plaintiff's social functioning.

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Agency Procedure filed on September 26, 2002 **[docket # 12]** is **GRANTED IN PART,** and this matter shall be remanded to the Commissioner of Social Security for further proceedings in accordance with this Memorandum Opinion and Order.

 

**W. DANIEL SCHNEIDER**
**UNITED STATES MAGISTRATE JUDGE**